UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WESLEY A. TEDROW, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-CV-453 RLM-MG |
| | ) | |
| FRANKLIN TOWNSHIP | ) | |
| COMMUNITY SCHOOL | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| *Defendants* | ) | |

<u>OPINION AND ORDER</u>

Wesley Tedrow sued Jill Britt, Melissa Morris, and the Franklin Township Community School Corporation for events during his employment as a teacher with the School Corporation. Mr. Tedrow brings various employment claims under the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Genetic Information Nondiscrimination Act of 2008, as well as a breach-of-contract claim under Indiana law. Mr. Tedrow now moves for summary judgment on all claims but breach of contract, [Doc. 103], and the defendants cross-move for summary judgment on all claims. [Doc. 130].

For reasons explained in this opinion and order, the court: grants Jill Britt and Melissa Morris's motion for summary judgment and dismisses them as defendants; grants in part and denies in part the School Corporation's motion for summary judgment; and denies in full Mr. Tedrow's motion for summary judgment.

I. BACKGROUND

These facts are undisputed, unless otherwise indicated.

Wesley Tedrow started teaching for the Franklin Township School Corporation in 2012. He began teaching third grade at Arlington Elementary School in 2015. Melissa Morris was Arlington Elementary School's principal and Jill Britt was the School Corporation's director of human resources while Mr. Tedrow taught at Arlington Elementary School.

Mr. Tedrow received positive performance reviews for several years. In the fall of 2017, Mr. Tedrow requested and was granted six weeks of leave under the Family and Medical Leave Act for his anxiety disorder. He returned to Arlington Elementary at the end of his FMLA leave.

In the spring of 2019, Mr. Tedrow had a disagreement with Principal Morris. The parent of a student in the special education program asked to accompany the student on a field trip. The parent didn't have a background check as required of chaperones. Principal Morris instructed Mr. Tedrow to allow the parent on the trip. Mr. Tedrow questioned whether this was proper without a background check, so called human resources to verify. When Principal Morris found out, she told Mr. Tedrow that she and Ms. Britt approved of the parent's request and told him not to go to human resources behind her back. Mr. Tedrow emailed the union president, asking if it was proper to allow a parent without a background check on the field trip and complaining that Principal Morris and Ms. Britt acted unreasonably. He asserted that Principal Morris abused her power or bullied him. Dr. Kent Pettet, the School Corporation's Chief People

Officer, eventually told Principal Morris that she communicated poorly to Mr. Tedrow and could've handled the situation better.

That same month, the School Corporation started receiving complaints from staff about Mr. Tedrow. Gina Gaddis, an instructional assistant, complained that Mr. Tedrow engaged in inappropriately personal conversations and paid inappropriately close attention to Justice Klene, another teacher. Ms. Gaddis told the administration she was unwilling to work with Mr. Tedrow in the 2019–2020 school year. Angie Bruce, a fifth-grade teacher, complained that Ms. Tedrow paid inordinate attention to Ms. Klene, looking her up and down and asking for her phone number so they could see a movie together. Ms. Klene eventually devised a system with her colleagues to get out of uncomfortable situations with Mr. Tedrow — she would text "SOS" to Ms. Bruce and other teachers when Mr. Tedrow came to her classroom, so the other teachers could come and diffuse any uncomfortable situation.

Around the same time, Mr. Tedrow had an altercation with Lisa Eck, a guidance counselor at the school. According to Ms. Eck, Mr. Tedrow had always been friendly and professional, but his behavior changed around 2019 when he was argumentative with presenters at a workshop. At one point, Ms. Eck reports that Mr. Tedrow confronted her over a disagreement about the field trip, verbally attacking her and chasing her around a table in the teacher's lounge. Later that school year, Mr. Tedrow loudly reprimanded a fourth-grade student in the hallway, yelling that the student wouldn't be welcome back in his classroom. Ms. Eck told Mr. Tedrow he was wrong to exclude the student and Mr. Tedrow replied

3

by yelling at her in her office. She was scared and yelled a profanity, then headed to the principal's office. Mr. Tedrow followed her, continuing his yelling. Kathy Johnson, a receptionist, saw both incidents and found them alarming.

Mr. Tedrow's account is different. He says he didn't provoke Ms. Eck. She instead suddenly became aggressive and confrontational with Mr. Tedrow and yelled curse words at him.

Mr. Tedrow complained about the incident with Ms. Eck to his union representative. The union representative told Principal Morris that he wanted Ms. Eck to apologize, that Principal Morris wasn't doing her job, and that she would have addressed the issue differently if it were between two women. Mr. Tedrow claimed Ms. Johnson and Dr. Pettet told him that he was intimidating because of his big chest and deep voice and claimed he was targeted for being a man. Principal Morris recorded this conversation with the union representative in an email to Dr. Pettet describing some of the other teacher complaints.

Mackenzi Becker, a special education teacher, reported a similar exchange with Mr. Tedrow. She claims he came into her classroom yelling and demanding for information about a special education student's individualized educational plan. He intimidated Ms. Becker with his puffed-out chest, slammed the door upon leaving, and made Ms. Becker cry.

Mr. Tedrow says no such incident occurred. He simply asked Ms. Becker for a student's individualized educational plan. She was curt with him and the next day emailed him apologizing for the way she acted: "I apologize if I came off harsh with my body language, etc." [Doc. 118-4].

4

After the incident with Ms. Eck, Dr. Pettet met with Mr. Tedrow and shared staff concerns with him. Dr. Pettet claims he told Mr. Tedrow that his colleagues felt uncomfortable around him. Dr. Pettet observed during their meeting that Mr. Tedrow engaged in some of the same intimidating body language his colleagued complained of. He raised his voice, puffed up his chest, and otherwise seemed agitated. Mr. Tedrow remembers that during the meeting, Dr. Pettet told Mr. Tedrow that his deep voice and muscular body were a problem.

Around that same time, some of Mr. Tedrow's coworkers speculated about "roid rage" — steroid use might have made Mr. Tedrow aggressive and intimidating. When Principal Morris caught wind of that rumor, she informed Ms. Britt and Dr. Pettet that teachers were speculating about steroids.

The School Corporation's concerns continued in the 2019–2020 school year. Karen Hosimer, an educational assistant, reported an interaction with Mr. Tedrow in which he became aggressive and yelled at her.

The school administrators had known Mr. Tedrow to be personable and professional for several years and figured that any change in behavior might have a medical cause. They decided to order a fitness-for-duty exam to see if there was a medical cause that could be remedied rather than immediately disciplining or firing Mr. Tedrow. Ms. Britt sent a letter to Mr. Tedrow on October 4, 2019, notifying him that he would have to undergo a fitness-for-duty exam. Mr. Tedrow was placed on paid administrative leave pending completion of the examination.

Mr. Tedrow reported to the fitness-for-duty examiner's officer on October 14 and signed some of the necessary release-of-information and consent forms.

The examining doctor, Dr. Darren Higginbotham, decided he needed more information to reach a conclusion, so he asked Mr. Tedrow to consent to the release of medical information from Mr. Tedrow's medical providers. The forms were directed to Mr. Tedrow's endocrinologist and psychiatrist, included space for Mr. Tedrow to add restrictions to the releases, and explained that Mr. Tedrow could revoke authorization at any time. Mr. Tedrow signed the releases that day without adding restrictions. Before long, he told his doctors that he revoked the releases. One of his doctors told Dr. Higginbotham on October 16 that she'd be willing to consider more targeted requests but thought a blanket release did not "seem relevant given the circumstances." Dr. Higginbotham replied on October 17 that his responsibility was to report to the School Corporation only information relevant to Mr. Tedrow's job, that is, Mr. Tedrow's mental stability while working at an elementary school with young children and coworkers. Mr. Tedrow's providers didn't respond to Dr. Higginbotham's letter.

Six days after his letter to Mr. Tedrow's providers, Dr. Higginbotham told Ms. Britt that the fitness-for-duty exam was inconclusive. He explained that Mr. Tedrow signed the releases but then evidently told the providers to limit what they shared. Mr. Tedrow then cancelled a follow-up appointment with Dr. Higginbotham. According to Dr. Higginbotham, Mr. Tedrow was "guarded" and "defensive," revealing little about himself during the testing that did occur. Mr. Tedrow's guarded responses, revocation of medical releases, and cancelling of his meeting caused the inconclusive result.

Two days later, Ms. Britt told Mr. Tedrow about the inconclusive result and asked that Mr. Tedrow reinstate the releases by November 8. Mr. Tedrow asked why the examiner needed medical information. Ms. Britt explained the School Corporation's concerns: complaints of yelling, unprofessional communication, disrespectful speech to instructional assistants that caused none to want to work with him, and frequent overly personal communications with colleagues. She elaborated that the School Corporation ordinarily would discipline a teacher for such behavior but that it preferred the fitness-for-duty exam to see if the behavior had a medical cause that could be remedied. She cautioned Mr. Tedrow that failure to execute the releases by November 22 could result in discipline including termination.

Mr. Tedrow asked for an extension of time on November 20 and Ms. Britt agreed, giving him until November 27 to comply. Mr. Tedrow filed a charge with the Equal Employment Opportunity Commission on November 22. He complained in the charge that women outnumbered men at the school and the women were always treated better, that after he returned from his 2017 FMLA leave he was told he was "an intimidating muscular male," that the School Corporation refused to end his administrative leave pending the fitness-for-duty exam even though one of his providers wrote a letter saying he was fit for duty, and that he was denied a job elsewhere because of a "misleading or false reference" from the School Corporation. The charge alleged sex discrimination, disability discrimination, and retaliation. He didn't comply with Ms. Britt's directive to execute the medical releases.

On December 4, Principal Morris wrote a letter to Mr. Tedrow notifying him that she'd made the preliminary decision of cancelling his contract for insubordination and lack of fitness for duty. The letter recounted the timeline of the fitness-for-duty exam and Ms. Britt's correspondences with Tedrow. It then explained that Mr. Tedrow's insubordination or inconclusive fitness-for-duty exam alone would justify termination. The letter concluded by explaining Mr. Tedrow's statutory right to a private conference with the superintendent or superintendent's designee and the right to a conference with the school board. If Mr. Tedrow didn't timely request a conference with the superintendent, Principal Morris's preliminary decision would become final, subject to school board approval.

Mr. Tedrow requested a conference and met with Dr. Pettet and Mr. Tedrow's union representative. He read from a written statement that disputed the School Board's accusation of inappropriate behavior, complained that the exam required his medical records, and asserted that he was fit for duty according to his own providers. Mr. Tedrow accused Dr. Pettet of saying that he and others told him he was inherently intimidating because of his deep voice and muscles, and would be treated accordingly.

Dr. Pettet summarized the meeting in a December 17 letter to Mr. Tedrow and offered a sort of compromise — the School Corporation would continue to employ Mr. Tedrow at a different school if he supplied a fitness-for-duty examination from one of his own doctors, dismissed his pending EEOC charge, and signed a "last chance agreement." Dr. Pettet claims he and the School

Corporation only wanted Mr. Tedrow to dismiss his pending charge while the text of the letter indicates that Mr. Tedrow would waive all claims through his resignation and face termination if he violated the agreement.

Mr. Tedrow declined the agreement by email the next day. He said he appreciated the goodwill gesture but said the agreement had "largely dubious legal merit in addition to the unacceptable conditions of acknowledging behavior in which I have not and do not engage, [and] waiving all current and future rights to available due process." [Doc. 53-7]. He included a letter from one of his doctors attesting that Mr. Tedrow was fit for duty, though not addressing the School Corporation's concerns about aggressive behavior to coworkers and students. At the same time, Mr. Tedrow requested a private conference with the school board. Dr. Pettet then informed the school board of Mr. Tedrow's decision and told the board he agreed with Principal Morris's recommendation that Mr. Tedrow be terminated.

The board held its conference on January 13, 2020. Both the School Corporation and Mr. Tedrow were represented by counsel. Mr. Tedrow read from a written statement and claimed he was discriminated against because of his anxiety disorder and because he was male. The board issued an order summarizing its findings of facts and conclusion as to Mr. Tedrow's termination, explaining that it would not terminate Mr. Tedrow. The board found that the events leading to the fitness-for-duty exam "demonstrate[d] disruption to the school environment by both Tedrow and Morris" and that Mr. Tedrow's behavior was cause for action but didn't rise to the level of termination. This was based

in part on letters from two of Mr. Tedrow's doctors asserting he was fit for duty and not a danger to others. Though concluding that termination was unnecessary, the school board decided it would be best to relocate Mr. Tedrow away from Arlington Elementary because his relationship with Principal Morris had deteriorated.

The school board ordered that Mr. Tedrow resume work on February 17, 2020, and that for the rest of the 2019–2020 school year he teach in a temporary position at a school other than Arlington Elementary. If the School Corporation didn't find a permanent position for him in the 2019–2020 school year, it would find him a permanent position by the start of the 2020–2021 school year. After the school board made its decision, several colleagues including Ms. Eck, Ms. Becker, Ms. Johnson, and Ms. Klene wrote to the school board expressing their disapproval of its decision, reiterating their complaints, and sharing their preference not to work with Mr. Tedrow.

No permanent position was available when Mr. Tedrow returned to work, so he was assigned to fill in at Middle School East for a teacher out on leave under the FMLA. Weeks into the temporary assignment, Ms. Britt told Mr. Tedrow he could move to a third-grade position at Kitley Intermediate School, but he declined, explaining that he wanted to continue to help the teacher on leave and that he'd made progress developing relationships with the students and staff at Middle School East. He eventually moved to Kitley Intermediate in

July 2020 to teach fourth grade.[1] In February 2021, Principal Amy Miller put Mr. Tedrow on a performance improvement plan, instructing him to create daily lesson plans, communicate with parents more promptly, and the like. Principal Miller rescinded the plan in March.

Mr. Tedrow filed a second charge with the EEOC on August 10, 2020. He alleged discrimination from November 22, 2019, (the day of his first EEOC charge) to February 11, 2020 (when he complained by counsel to his reassignment to a temporary position). The charge alleged discrimination and retaliation under Title VII of the Civil Rights Act, the Americans with Disabilities Act, and the Genetic Information Nondiscrimination Act based on the fitness-for-duty exam, last chance agreement, and assignment to temporary positions. The EEOC issued a right-to-sue letter on February 8, 2021.

Mr. Tedrow's compensation and benefits were never reduced during his administrative leave, temporary position, and permanent positions. In March 2021, he left Kitley Intermediate to take long-term disability leave.

Mr. Tedrow then sued Melissa Morris, Jill Britt, and the School Corporation, alleging breach of contract; discrimination, harassment, and retaliation because of sex under Title VII; discrimination, harassment, and retaliation under the ADA; and discrimination and retaliation under GINA.

---

[1]     The parties first say Mr. Tedrow began at Kitley Intermediate in July 2021. The parties then say that Kitley Intermediate's principal, Amy Miller, conducted an evaluation in February 2021, and Mr. Tedrow worked at Kitley Intermediate until March 2021. That Mr. Tedrow began there in July 2021 instead of 2020 appears to be a clerical error.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, a court accepts the non-movant's evidence as true and draw all inferences in his favor. Id. at 255. The nonmoving party is not entitled to "[i]nferences that are supported by only speculation or conjecture." Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also Fed. R. Civ. P. 56(e)(2).

On cross-motions for summary judgment, the court construes all inferences in favor of the party against whom the motion under consideration is made. O'Regan v. Arb. Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001) (quoting Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 692 (7th Cir. 1998)).

III. DISCUSSION

*A. Ms. Britt and Principal Morris's Motion for Summary Judgment*

Jill Britt and Melissa Morris move for summary judgment on all claims remaining against them. [Doc. 130].

Ms. Britt and Principal Morris first argue they're entitled to summary judgment on each of Mr. Tedrow's federal-law claims (Title VII, the ADA, and GINA) because those laws impose liability on an employer but the individual defendants weren't Mr. Tedrow's employers. Title VII and the ADA each define "employer" to include an employer's agents. Williams v. Banning, 72 F.3d 552, 553–554 (7th Cir. 1995). GINA incorporates the same definition. 42 U.S.C. § 2000ff(2)(B)(i) (incorporating 42 U.S.C. § 2000e(f)). Inclusion of an employer's agents imposes "traditional respondeat superior liability" on the employer, but "imposes no individual liability on agents." Williams v. Banning, 72 F.3d at 553 (Title VII and the ADA); *see* Bumphus v. Unique Person. Consultants, No. 16-CV-312, 2018 U.S. Dist. LEXIS 54710, at *11 (N.D. Ill. Mar. 30, 2018) (GINA).

Ms. Britt and Principal Morris are correct that Title VII the ADA and GINA don't impose liability on an employer's agents and Mr. Tedrow agrees that they're entitled to summary judgment. [Doc. 132 at 20].

Ms. Britt and Principal Morris then argue that they weren't party to any of Mr. Tedrow's four alleged contracts — the regular teachers' contract, the collective bargaining agreement, the certified staff handbook, and the teacher evaluation system. Mr. Tedrow agrees, [Doc. 132 at 20], and no designated evidence shows that they were party to any contract with Mr. Tedrow.

13

For these reasons, the court grants the defendants' motion for summary judgment as to Ms. Britt and Principal Morris on all claims, [Doc. 130], dismisses them as defendants, and denies Mr. Tedrow's motion for summary judgment against Mr. Britt and Principal Morris. [Doc. 116].

### B. Mr. Tedrow's Evidentiary Objections

Mr. Tedrow raises procedural and evidentiary objections to some of the School Corporation's designated evidence. The admissibility of the evidence bears on the School Corporation's arguments in support of their motion and in opposition to Mr. Tedrow's, so the objections are best resolved at the start.

Angie Bruce, Gina Gaddis, Lisa Eck, Mackenzi Becker, and Kathy Johnson all worked with Mr. Tedrow. Each supplied a declaration describing Mr. Tedrow's behavior as aggressive and inappropriate. The School Corporation relies on their declarations to show that it had legitimate concerns over Mr. Tedrow's conduct and ability to work as a teacher and that the School Corporation had legitimate non-pretextual reasons for taking certain actions. Mr. Tedrow argues that each declaration should be excluded or stricken from summary judgment.

Mr. Tedrow first argues that all five declarations should be stricken because the School Corporation didn't timely disclose them. Federal Rule of Civil Procedure 26 requires that a party disclose the names of individuals likely to have discoverable information and documents that might support claims and defenses. Fed. R. Civ. P. 26(a)(1)(A)(i), (ii). A party who doesn't disclose such a person or document can't use that witness to supply evidence on a motion. Fed.

R. Civ. P. 37(c)(1). Mr. Tedrow claims Rule 26 obligated the School Corporation to disclose all five declarations, but the School Corporation didn't do so until after serving a witness and exhibit list and serving its motion for summary judgment. The School Corporation responds by arguing that Rule 26 applies to witnesses, but not their declarations. *See* <u>King v. Ford Motor Co.</u>, 872 F.3d 833, 838 (7th Cir. 2017).

All five witnesses were disclosed (Mr. Tedrow doesn't dispute that), so the dispute is whether School Corporation needed to disclose the declarations. Declarations resemble "documents," but are really anticipated oral trial testimony, in written form for convenience at summary judgment. <u>Intel Corp. v. VIA Techs., Inc.</u>, 204 F.R.D. 450, 451–452 (N.D. Cal. Dec. 12, 2001). "The classic declaration gathered in anticipation of a summary-judgment motion is not within the purview of the 'document' concept." <u>Id.</u> The School Corporation properly disclosed the witnesses and wasn't obligated to disclose the declarations, so the court overrules Mr. Tedrow's objection under Rules 26 and 37.

Mr. Tedrow objects to the declarations under Federal Rule of Evidence 807(b). A hearsay statement that doesn't fall within an exception or exclusion to hearsay may still be admitted into evidence under Rule 807, the residual exception to hearsay. Fed. R. Evid. 807. A party seeking admission of evidence under Rule 807 must provide reasonable notice of its intent to admit a statement under Rule 807. Fed. R. Evid. 807(b). Mr. Tedrow argues the declarations are inadmissible because they don't comply with Rule 807(b)'s notice requirement. But the School Corporation doesn't seek to admit the declarations under Rule

15

807 and Mr. Tedrow hasn't explained why Rule 807 is the declarations' only path into evidence, so any failure to comply with Rule 807(b) is irrelevant to the declarations' admissibility. The court overrules the Rule 807 objection.

Mr. Tedrow objects to Ms. Bruce and Ms. Gaddis's declarations under Federal Rule of Evidence 403. Rule 403 excludes evidence if its probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, and other risks. Fed. R. Evid. 403. Mr. Tedrow argues the declarations are highly prejudicial and would confuse the issues because they purport to relay Justice Klene's concerns, but there's no corresponding declaration from Justice Klene; they involve subjective romantic sentiments and behaviors; and they're subjective beliefs that are immaterial to any claims or defenses.

The declarations are prejudicial to Mr. Tedrow in that they cut against his claims and in favor of the School Corporation's defenses, but the prejudice isn't unfair. The declarations are highly relevant to the School Corporation's defenses regarding other teachers' concerns and complaints about Mr. Tedrow. That the declarations describe subjective belief doesn't make the declarations unfairly prejudicial or likely to confuse the issue. The risk of unfair prejudice and confusing the issue do not substantially outweigh the declarations' probative value, so the court overrules Mr. Tedrow's Rule 403 objection.

Mr. Tedrow objects to the declarations of Lisa Eck, Mackenzi Becker, and Kathy Johnson under Federal Rule of Evidence 803, which describes various exceptions to the rule against hearsay. Mr. Tedrow argues that each declaration is a present sense impression, statement of then-existing mental or emotional

conditions, or recorded recollection, Fed. R. Evid. 803(1), (3), (5), but wasn't prepared until nearly three years after the statements, so is inadmissible.

These Rule 803 exceptions only come into play if a statement is hearsay. Mr. Tedrow doesn't argue why the declarations are hearsay in the first instance. His arguments focus on the declarants' lack of credibility and why the declarations' contents are fishy compared to other evidence. Each declarant described her own observations, thoughts, feelings, and the like, so the declarations aren't hearsay and the court overrules the Rule 803 objection.

Mr. Tedrow raises a few other objections to the School Corporation's evidence, citing various rules of evidence. These objections, though framed as objections under specific rules of evidence, are really arguments that Mr. Tedrow's evidence conflicts with and is more credible than the School Corporation's evidence. Credibility determinations are separate from admissibility and are for a factfinder, not for a court at summary judgment, so the court overrules any such objections.

Finally, Mr. Tedrow requests that the court treat forty-five of his material facts as admitted. [Doc. 132 at 13]. He explains that in his opening brief, he presented fifty-five potentially dispositive facts and that the School Corporation controverted only ten of them in their response. So the court ought to treat those as supported, uncontroverted, and admitted under Local Rule 56-1(f)(1)(A).

The School Corporation wasn't required to controvert every paragraph when it instead contradicted Mr. Tedrow's facts through its own statement of

material facts and argument, <u>Owen v. Kroger Co.</u>, 936 F. Supp. 579, 581 n.1 (S.D. Ind. 1996), so the court overrules the objection.

### C. Breach of Contract

Mr. Tedrow claims he had four contracts with the School Corporation: (1) his regular teacher contract, (2) the collective bargaining agreement, (3) the staff handbook, (4) and the teacher evaluation system. He claims the School Corporation breached each of the four. Mr. Tedrow originally moved for summary judgment on the breach-of-contract claim but then withdrew the motion as to breach of contract. [Doc. 126].

The School Corporation moves for summary judgment on the breach-of-contract claim. To prevail on a breach-of-contract claim, a plaintiff must show that: (1) a contract existed; (2) the defendant breached the contract; and (3) the plaintiff suffered damages because of the defendant's breach. <u>Collins v. McKinney</u>, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). The School Corporation contends that it didn't breach the regular teacher contract or the collective bargaining agreement and that the staff handbook and teacher evaluation system simply weren't contracts.

First, the School Corporation argues there's no genuine dispute about breach of the regular teacher contract. Indiana law requires that a regular teacher contract include certain provisions, like the beginning date of the school term, total salary to be paid, and the number of hours to be worked each week. Ind. Code §§ 20-28-6-2(a), -5. Mr. Tedrow's contract specified that he work from

July 1, 2019, to June 30, 2020, and provided his total salary. It said nothing about Mr. Tedrow's assignment to any grade level, subject, or building. Every time the School Corporation changed Mr. Tedrow's teaching assignment, his compensation and benefits stayed the same. The School Corporation argues there's no genuine issue as to breach because no evidence shows that it acted contrary to the contract's terms.

Second, the School Corporation argues that there's no genuine dispute over breach of the collective bargaining agreement. Indiana allows collective bargaining agreements to govern salary, wages, and wage-related fringe benefits, Ind. Code § 20-29-6-4, but any other subjects are forbidden in collective bargaining. Id. § 20-29-6-4.5(a)(5). The collective bargaining agreement sets out a grievance policy for teachers. If a teacher is dissatisfied with how the grievance was resolved or if the administrator responsible for responding to the grievance doesn't timely respond, the teacher must escalate the grievances to the board secretary. The School Corporation argues that Mr. Tedrow's complaints about reassignment didn't involve salary, wages, or wage-related fringe benefits, so they weren't part of the collective bargaining agreement. Even if they were, Mr. Tedrow didn't escalate the grievance, so he didn't comply with its procedures.

Third, the School Corporation argues the certified staff handbook wasn't a contract at all. In Indiana, a handbook includes matters that a school corporation must discuss with a teacher's union, Ind. Code § 20-29-6-7, unlike employment matters subject to bargaining. Id. § 20-29-6-4. So while the latter category of bargaining matters is contractual, the former category of discussion

19

matters is not. *Cf.* Harris v. Brewer, 49 N.E.3d 632, 640–642 (Ind. Ct. App. 2015) (discussing limited circumstances in which employee handbook is a contract).

Fourth and finally, the School Corporation argues the teacher evaluation system wasn't a contract. Rather than a contract, the evaluation system is a way to give feedback for professional development, so Principal Amy Miller's rescission of Mr. Tedrow's January 2021 evaluation wasn't any breach of contract. The School Corporation argues that if the evaluation system is a contract, any negative review could become a breach-of-contract claim.

Mr. Tedrow doesn't respond to the substance of these arguments. Acknowledging that he withdrew his motion for summary judgment on breach of contract, Mr. Tedrow says in his reply/response brief that the court could nevertheless grant judgment in his favor "*sua sponte* [based on] previous facts and arguments Tedrow incorporates here." [Doc. 132 at 37]. The previous argument and evidence are his brief in opposition to the defendants' motion to dismiss, [Doc. 52], and the court's opinion granting in part and denying in part the defendants' motion to dismiss, [Doc. 73].

The court declines to consider Mr. Tedrow's incorporated arguments. By attempting to incorporate arguments from other briefs and opinions without making those arguments, Mr. Tedrow asks the court to "read everything [he] ha[s] filed and determine how the arguments [he] make[s] and the information [he] provide[s] in Document A might be applied to bolster the argument [he] make[s] in Document C." McCarthy v. Fuller, No. 1:08-CR-994, 2014 U.S. Dist. LEXIS 130848, at *8–9 (S.D. Ind. Sept. 18, 2014), *rev'd and remanded on other*

*grounds*, 810 F.3d 456 (7th Cir. 2015). This unfairly deprives the opposing party the opportunity to respond to an argument that the court might construct, id., amounts to a "self-help increase in the length of the . . . brief,"[2] DeSilva v. DiLeonardi, 181 F.3d 865, 866 (7th Cir. 1999), and inappropriately asks the court to "play archaeologist with the record." Id. at 867.

Mr. Tedrow waived the breach-of-contract claim by not substantively responding to the School Corporation's motion for summary judgment on that claim. *See* Pugh v. City of Attica, 259 F.3d 619, 624 n.3 (7th Cir. 2001). Regardless of waiver, each of the School Corporation's arguments shows that there's no genuine issue of material fact as to Mr. Tedrow's breach-of-contract claim. The court grants summary judgment in the School Corporation's favor on Mr. Tedrow's breach-of-contract claim.

### D. Title VII Discrimination

Mr. Tedrow claims that the School Corporation discriminated against him because of sex in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits employers from discriminating against an employee because of the

---

[2]     Mr. Tedrow separately appears to have engaged in self-help by reducing his reply/response brief's font below Local Rule 5-1(b)'s required 12-point font. The court overlooked this formatting irregularity in the interest of proceeding to the merits but won't give Mr. Tedrow the added benefit of enlarging the brief by incorporating arguments made elsewhere.

That's not to say that the School Corporation has clean hands; although the School Corporation appears not to have evaded page limits by reducing its font size, it generously used block formatting for text that was argument rather than block quotations, saving itself considerable space. [Doc. 135 at 7–9, 13–19].

employee's sex. 42 U.S.C. § 2000e-2(a)(1). Mr. Tedrow and the School Corporation both move for summary judgment on the sex-discrimination claim.

To survive summary judgment, a plaintiff claiming discrimination must present evidence that would allow a reasonable factfinder to conclude that the plaintiff's sex caused an adverse employment action. Khungar v. Access Cmty. Health Network, 985 F.3d 565, 573 (7th Cir. 2021) (citing Ortiz v. Werner Enters., Inc., 834 F.3d 760, 765 (7th Cir. 2016)). A plaintiff can use the McDonnell Douglas burden-shifting framework to organize evidence of discrimination, or can show that the totality of the evidence would allow a reasonable factfinder to find discrimination. Purtue v. Wis. Dep't of Corr., 963 F.3d 598, 601–602 (7th Cir. 2020).

Under the McDonnell Douglas framework, a plaintiff makes a prima facie case of sex discrimination by presenting evidence that: (1) the plaintiff is a member of a protected class; (2) the plaintiff performed his job to his employer's expectations; (3) the plaintiff suffered an adverse employment action; and (4) one or more similarly situated persons outside the protected class were treated better. Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 720 (7th Cir. 2018). If the plaintiff establishes a prima facie case of discrimination, the employer then has the burden of showing a legitimate, nondiscriminatory reason for the employment action. Id. If the employer meets that burden, the burden shifts back to the employee to show that the employer's reason was pretextual. Id. A court considers the evidence as a whole to determine whether a reasonable

factfinder could find that the plaintiff's sex caused the adverse employment action. *See* Ortiz v. Werner Enters., Inc., 834 F.3d at 765.

The School Corporation argues that it's entitled to summary judgment because Mr. Tedrow can't prove a materially adverse employment action. A plaintiff must show a materially adverse employment action whether using the McDonnell Douglas framework or proceeding more holistically. Materially adverse employment actions fall generally into three categories: (1) cases in which an employee's compensation, benefits, and financial conditions of employment are reduced, including termination; (2) cases in which a nominally lateral transfer significantly reduces the employee's career prospects by preventing him from using specialized skills, such that his skills atrophy and future employment prospects diminish; and (3) cases in which work conditions are changed such that the employee is subject to humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative conditions. Herrnreiter v. Chi. Hous. Auth., 315 F.3d 742, 744–745 (7th Cir. 2002). Altering job responsibilities and mere inconveniences aren't materially adverse employment actions. Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004).

Mr. Tedrow identifies six of the School Corporation's actions as materially adverse employment actions. First, the School Corporation made him submit to a psychological fitness-for-duty exam. Second, the School Corporation placed Mr. Tedrow on administrative leave pending the exam. Third, the School Corporation reassigned Mr. Tedrow involuntarily to a temporary position after his administrative leave. Fourth, the School Corporation assigned a female

teacher to his former classroom while he was on leave for the exam. Fifth, Principal Morris gave Mr. Tedrow a preliminary termination notice. Sixth and finally, Dr. Pettet recommended that the Board terminate Mr. Tedrow.[3] Each of the actions Mr. Tedrow advances falls short of being materially adverse, so the School Corporation is entitled to summary judgment on Mr. Tedrow's Title VII discrimination claim.

### Fitness-for-Duty Exam

Mr. Tedrow claims the School Corporation discriminated against him by making him undergo a psychological fitness-for-duty exam. Employers generally can require an employee to undergo a medical exam to determine whether the employee can perform work functions safely. Freelain v. Vill. of Oak Park, 888 F.3d 895, 904–905 (7th Cir. 2018). A fitness-for-duty exam might creep from permissible to impermissible if the employer singles the plaintiff out for an exam while leaving other similarly situated employees alone, when the plaintiff shows the exam was unrelated to the employer's justification for the exam, or when the exam is ordered for an illegal purpose. Id. at 904 (citing Place v. Abbott Labs., 215 F.3d 803, 809 (7th Cir. 2000)).

---

[3] Mr. Tedrow states repeatedly in his briefs that he was terminated. He offers no evidence or explanation rebutting the School Corporation's evidence that it never fired him, so any claim that he was discriminated against when he was fired lacks merit.

The School Corporation claims to have ordered the exam because administrators received complaints about Mr. Tedrow behaving aggressively and observed some such behavior. The administrators suspected the change in behavior might have a psychological cause, so they ordered an exam rather than resorting immediately to discipline or termination. The School Corporation supports its claim that Mr. Tedrow had become aggressive with Ms. Becker, Ms. Eck, Ms. Johnson, Ms. Gaddis, and Ms. Bruce's declarations. It supports its claim that school administrators had received complaints with the deposition testimony of Ms. Britt, Principal Morris, and Dr. Pettet. Together with attesting to the complaints they received, the three administrators also attested to their concern that Mr. Tedrow's personality might have changed for psychological reasons and that they preferred to address the concerns with a fitness-for-duty exam rather than resort immediately to disciplinary measures.

These facts show that the School Corporation had good reason to question whether Mr. Tedrow could work safely with others. "An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position," Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002) (discussing the ADA). The exam was presumptively permissible since an employer is generally allowed to use fitness-for-duty exams to determine whether an employee can safely do the job. Freelain v. Vill. of Oak Park, 888 F.3d at 904.

Mr. Tedrow argues the exam was impermissible because there's no admissible evidence of his allegedly bad behavior. The School Corporation lacks

evidence of bad behavior if the staff declarations are inadmissible, but for reasons explained earlier, each of the declarations is admissible. Still, Mr. Tedrow creates genuine disputes about the episodes with Ms. Becker and Ms. Eck — his deposition testimony shows he denied being aggressive toward Ms. Eck and Ms. Becker and attested that Ms. Eck was aggressive to him. A factfinder could believe Mr. Tedrow and find that he wasn't aggressive to Ms. Becker or Ms. Eck and that and that Ms. Eck was aggressive to Mr. Tedrow.[4]

The fact disputes about Ms. Eck and Ms. Becker aren't enough to create a genuine dispute over the School Corporation's reasons for ordering the fitness-for-duty exam. Mr. Tedrow doesn't dispute the School Corporation's evidence that it received several complaints about his behavior nor disputes the administrators' explanation that they ordered the exam because of the complaints and their personal observations of changed behavior. Undermining the basis of two complaints out of many doesn't controvert the effect several complaints would have on the School Corporation or show that the School Corporation acted in bad faith. Neither do the fact disputes support an inference that Mr. Tedrow was singled out. Even if Ms. Becker and Ms. Eck were aggressive, their aggression would be limited to single incidents, unlike the string of complaints the School Corporation received about Mr. Tedrow. Comparing

---

[4]     Mr. Tedrow argues that Ms. Becker acted aggressively toward him. He cites a note she wrote apologizing for her harsh body language. The note lacks context and the apology is so vague that a factfinder would really need to squint to conclude that Ms. Becker ever acted aggressively to Mr. Tedrow.

single complaints to Mr. Tedrow's several complaints is like apples and oranges, and a reasonable jury couldn't conclude Mr. Tedrow was singled out.

Mr. Tedrow argues that the fitness-for-duty exam was improper because Ms. Britt, Principal Morris, and Dr. Pettet admitted that he never threatened anyone, and a fitness-for-duty exam is proper only when an employee threatens violence. He cites their deposition testimony for support, but his characterization of their testimony elides important context. The administrators admitted in one breath that Mr. Tedrow didn't explicitly threaten coworkers, then in another breath explained that his body language, tone, demeanor, and actions made coworkers feel threatened and intimidated. Accepting Mr. Tedrow's argument would imply a rule that an employee can intimidate and threaten others without recourse, so long as the employee doesn't make an explicit verbal threat. The administrators' admissions that Mr. Tedrow never made an explicit threat doesn't undermine their claims to a good-faith belief that Mr. Tedrow intimidated his coworkers by other means.

Nor is Mr. Tedrow's assertion that a fitness-for-duty exam is justified only by acts or explicit threats of physical violence correct. The cases he cites describe physical violence as justification for a psychological fitness-for-duty exam, but none of the cases described physical violence as the dividing line between permissible and impermissible fitness-for-duty exams. *E.g.*, Nichols v. S. Ill Univ.-Edwardsville, 510 F.3d 772, 786–787 (7th Cir. 2007). An employee's physical violence can justify a fitness-for-duty but so can other disruptive or

27

worrisome behaviors. Drawing the line at physical violence relies on a distinction without a difference.

The summary judgment record undisputedly shows that the School Corporation received complaints casting doubt on whether Mr. Tedrow could work safely with others. "An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position," Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002) (discussing the ADA), and an employer generally IS allowed to use fitness-for-duty exams to determine whether an employee can safely do the job. Freelain v. Vill. of Oak Park, 888 F.3d 895, 904 (7th Cir. 2018). The School Corporation had a legitimate reason to order a fitness-for-duty exam. Although Mr. Tedrow creates genuine issues of fact as to what happened between himself and Ms. Becker and himself and Ms. Eck, those factual disputes couldn't show that the School Corporation singled him out improperly, ordered the exam for some unstated reason, or ordered the exam for some illegal reason.[5] The fitness-for-duty exam wasn't a materially adverse employment action, and Mr. Tedrow's Title VII discrimination claim can't rest on the fitness-for-duty exam.

---

[5]     Mr. Tedrow argues that the fitness-for-duty examination violated the ADA and GINA. Discussion of those statutes comes later.

<u>Administrative Leave Pending a Fitness-for-Duty Exam</u>

Mr. Tedrow claims the School Corporation discriminated against him by placing him on administrative leave pending completion of his fitness-for-duty exam. Administrative leave pending a fitness-for-duty exam isn't materially adverse if the plaintiff keeps the same compensation, benefits, and position. <u>Nichols v. S. Ill. Univ.-Edwardsville</u>. 510 F.3d at 787. Mr. Tedrow doesn't claim to have had his pay or benefits reduced. As explained with the breach-of-contract claim, Mr. Tedrow was entitled to a teaching position but not to a specific classroom, grade, or subject within the School Corporation. His position didn't change even though he was reassigned to a different teaching role after his administrative leave.

Mr. Tedrow tries to show that his administrative leave was materially adverse because he lost out on a job that would pay more. Mr. Tedrow sought employment with a different school district that would pay more but was thwarted when Ms. Britt refused to provide an employment reference. Mr. Tedrow again seeks to incorporate arguments from the motion-to-dismiss stage and does little to develop this argument in his summary judgment briefing. He doesn't repeat or summarize those arguments; he purports to incorporate them.

As with the breach-of-contract claim, that won't do. Incorporating separate arguments (from a different stage of litigation with different standards) require a court to read additional material and piece together an argument for the proponent, deprives the opposing party the opportunity to fully respond to whatever argument the court might construct, and allows the party to evade page

limits. <u>McCarthy v. Fuller</u>, No. 1:08-CR-994, 2014 U.S. Dist. LEXIS 130848, at *9 (S.D. Ind. Sept. 18, 2014).

Ms. Britt's apparent refusal to provide a reference affected a potential employment relationship with a third party rather than altering the conditions of employment with the School Corporation. *See* <u>Brewer v. Bd. of Trs. of the Univ. of Ill.</u>, 479 F.3d 908, 916 (7th Cir. 2007). It also didn't reduce his compensation or imperil his job prospects by atrophying his skills. *See* <u>Herrnreiter v. Chi. Hous. Auth.</u>, 315 F.3d 742, 744 (7th Cir. 2002).

Mr. Tedrow's administrative leave wasn't materially adverse whether considered with or without Ms. Britt's refusal to provide an employment reference, so it can't be the basis of a Title VII claim.

<u>Moving Mr. Tedrow to a Temporary Teaching Position</u>

Mr. Tedrow claims the School Corporation discriminated against him by placing him in a temporary teaching position after his administrative leave. The School Corporation relies on the strength of <u>Lucero v. Nettle Creek School Corp.</u> to dispense of this claim. 566 F.3d 720 (7th Cir. 2009). In <u>Lucero v. Nettle Creek</u>, the plaintiff teacher was reassigned to a "floater teacher" position. <u>Id.</u> at 730–731. Rather than teaching Honors English to seniors, she was reassigned to teach English to seventh and eighth graders and to supervise a study hall. <u>Id.</u> The teacher's compensation and benefits didn't change, and she had no evidence that the reassignment reduced future employment prospects. The decision exemplifies the rule that a lateral transfer is actionable only if it "significantly

reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted." <u>Herrnreiter v. Chi. Hous. Auth.</u>, 315 F.3d at 744.

Mr. Tedrow tries to evade <u>Lucero v. Nettle Creek School Corp.</u> by referring to his response brief in opposition to the School Corporation's motion to dismiss. By improperly seeking to incorporate arguments made elsewhere again, Mr. Tedrow waives any argument on this point.

Mr. Tedrow's reassignment to a floater position didn't include a reduction in compensation or benefits and Mr. Tedrow supplies no evidence that the lateral transfer was lateral in name but a demotion in practice. Mr. Tedrow's reassignment doesn't support his Title VII discrimination claim.

<u>Replacing Mr. Tedrow with a Female Colleague</u>

Mr. Tedrow claims the School Corporation discriminated against him by assigning a female colleague to his teaching spot during and after his administrative leave. That the School Corporation chose a female colleague to take Mr. Tedrow's old spot might support a discrimination claim if Mr. Tedrow' administrative leave or reassignment were a materially adverse employment action. Neither was materially adverse and without more, replacing Mr. Tedrow with a woman can't support a discrimination claim.

<u>Preliminary Notice of Termination and Termination Recommendation</u>

Mr. Tedrow argues the School Corporation discriminated against him when Principal Morris gave him a preliminary notice of termination and when Dr. Pettet recommended that the school board terminate Mr. Tedrow.

The School Corporation argues that neither is a materially adverse employment action. Principal Morris made a preliminary termination decision, which requires written notice to the teacher and triggers procedures for the teacher, superintendent, and others. *See* Ind. Code § 20-28-7.5-2. Although a principal can make a preliminary decision of termination, ultimate authority rests with the school board, which can terminate the teacher if a preponderance of the evidence supports cancelling the teaching contract. <u>Id.</u> The School Corporation argues that because Principal Morris and Dr. Pettet never had the authority to terminate Mr. Tedrow, their recommendations weren't materially adverse. Mr. Tedrow's compensation and benefits remained the same throughout the process.

Mr. Tedrow doesn't offer a robust response to these arguments. He says that the School Corporation admitted to firing him because it admitted in briefing that he didn't obtain employment elsewhere after Ms. Britt refused to provide an employment reference. That's misleading. The School Corporation asserted that Mr. Tedrow didn't obtain employment elsewhere to demonstrate that he was never terminated. The School Corporation didn't admit that Mr. Tedrow was ever fired or unemployed and never admitted to preventing or inhibiting Mr. Tedrow from finding other work.

32

Mr. Tedrow then says that Principal Morris and Dr. Pettet's actions were materially adverse because they caused damages. He points to a section of his brief titled "damages." [Doc. 132 at 37–40]. That section comprises several block quotes taken from Mr. Tedrow's communications with his psychiatrist and the school administrators. Most explain how anguished he was to be in termination proceedings. Two mention that Mr. Tedrow was diagnosed with cancer around March 2021. In a separate section on retaliation, Mr. Tedrow says he suffered damages through the process because Mr. Pettet admitted at his deposition that Mr. Tedrow would lose income if he were unemployed and that someone like Mr. Tedrow could suffer physical and mental health effects from being terminated.

These arguments don't show that Principal Morris and Dr. Pettet's actions were materially adverse for purposes of Title VII discrimination. Principal Morris's preliminary decision and Dr. Pettet's recommendation started a process for the school board to decide whether to fire Mr. Tedrow, but didn't change his position, compensation, or benefits. Mr. Tedrow doesn't address the School Corporation's argument that this separation of authority shows no discrimination, waiving any argument to the contrary. The damages section of the brief shows that Mr. Tedrow was subjectively anguished, but subjective feelings about employment actions don't make an employment action materially adverse. Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d at 780–781. Likewise, Dr. Pettet admitted that Mr. Tedrow and his family would suffer emotional and financial loss if he was fired. The School Corporation never fired Mr. Tedrow, so

Dr. Pettet's response was no more than speculation in response to a hypothetical question.

Although Mr. Tedrow doesn't raise his performance improvement plan in his opening brief, the School Corporation argues that the performance improvement plan wasn't a materially adverse employment action. It argues that the performance improvement plan wasn't onerous, so wasn't materially adverse. "Performance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions." Davis v. Time Warner Cable of Se. Wis., L.P., 651 F.3d 664, 677 (7th Cir. 2011). Second, even if it were, the School Corporation argues Mr. Tedrow can't bring the claim because he omitted it from his EEOC charge. See Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 726 (7th Cir. 2003) ("Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC."). Mr. Tedrow offers no response. No evidence supports that the performance improvement plan was anything more than ordinary, so performance improvement plan can't sustain Mr. Tedrow's Title VII discrimination claim whether he waived it or didn't.

To conclude, the School Corporation has shown that Mr. Tedrow didn't suffer any materially adverse employment actions, an essential element to a Title VII discrimination claim. The parties make other arguments about legitimate employer expectations, comparators, and pretext, but the court need not reach those arguments because a Title VII claim requires proof of a materially adverse employment action whether presented through the McDonnell Douglas framework or the more holistic approach. The court grants the School

Corporation's motion for summary judgment and denies Mr. Tedrow's motion for summary judgment as to Title VII discrimination.

### E. Title VII Harassment

Mr. Tedrow brings a Title VII harassment claim. He alleges the School Corporation created a hostile work environment by failing to investigate his complaints about Principal Morris, making comments about his masculine musculature and voice, and spreading rumors that Mr. Tedrow used steroids.

A plaintiff proves sexual harassment by showing that: (1) the plaintiff was subject to unwelcome harassment; (2) the harassment was based on the plaintiff's sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *See* Johnson v. Advoc. Health & Hosps. Corp., 892 F.3d 887, 900 (7th Cir. 2018) (discussing harassment based on race). Harassment is actionable only when it makes the work environment objectively and subjectively unreasonable. Kampier v. Emeritus Corp., 472 F.3d 930, 941 (7th Cir. 2007). Objective reasonableness depends on the frequency and severity of the conduct, whether conduct was physically threatening or humiliating or merely an offensive utterance, and whether the offensive conduct interfered with the plaintiff's work performance. Id. (citing Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806–807 (7th Cir. 2000)).

After the altercation with Ms. Eck, Mr. Tedrow complained to his union representative about the way Principal Morris handled the incident. He

complained that Principal Morris wasn't doing her job, that Ms. Eck should apologize to him, and he said that if the altercation had been between two women instead of a man and a woman, Principal Morris "would be addressing the issue." [Doc. 119-2]. The union representative shared this complaint with Principal Morris, who in turn shared it with Ms. Britt. Mr. Tedrow complains that they never investigated what he viewed as sex discrimination. He cites the School Corporation's own policies that didn't require a formal procedure to lodge complaints and points out that the School Corporation investigated two female colleagues' recent complaints of sex discrimination. He adds to this argument his complaint that Principal Morris reprimanded him after the field trip disagreement even though she never treated a woman the same way.

Mr. Tedrow also complains of sexual harassment related to his body. Some of the coworkers who complained about Mr. Tedrow speculated that steroid use might have caused his perceived aggression and volatility. The school administrators made matters worse according to Mr. Tedrow — Principal Morris allegedly admitted to telling Ms. Britt and Dr. Pettet that Mr. Tedrow was abusing steroids, and told Mr. Tedrow that his muscles and deep voice intimidated others. Then, Dr. Pettet told Mr. Tedrow that his muscles and deep voice intimidated his colleagues. Ms. Britt included rumors of steroid use in the referral to Dr. Higginbotham, so he learned of the rumor, as did the school board. Mr. Tedrow emphasizes that these rumors were especially hurtful because of his body dysmorphia and anxiety. He was also a competitive powerlifter at the time, so accusations of steroid use could interfere with his competition eligibility. He

36

concludes that all these actions taken together created a hostile work environment based on his sex.

Several of Mr. Tedrow's assertions find no support in the summary judgment record. He claims Principal Morris admitted to telling others that he might be using steroids, that is, that she asserted as her own opinion that Mr. Tedrow abused steroids. The evidence he cites shows that Principal Morris admitted to telling Ms. Britt and Dr. Pettet about what *others* were saying. None of the evidence shows that she asserted those rumors to be true or otherwise adopted the speculation of others. Mr. Tedrow asserts that Principal Morris told him that his muscles and deep voice were intimidating, but the evidence he cites only shows that Principal Morris warned Mr. Tedrow that his demeanor intimidated others, without reference to his muscles or voice. Mr. Tedrow says Dr. Pettet admitted to telling him that his muscles and deep voice were intimidating. Mr. Tedrow cites his own written statement accusing Dr. Pettet of saying those things. He doesn't substantiate that Dr. Pettet admitted to saying those things.

Finally, Mr. Tedrow says Ms. Britt spread the steroid rumor to Dr. Higginbotham, so the rumors spread from his report to the school board. Mr. Tedrow doesn't support this assertion with evidence and the record citations for similar assertions don't support that Ms. Britt spread this information to Dr. Higginbotham. Mr. Tedrow's lawyer asked Ms. Britt whether she told Dr. Higginbotham that Mr. Tedrow used performance enhancing drugs and she said no. Dr. Higginbotham asked one of Mr. Tedrow's providers about his testosterone

supplementation in a letter, but the same letter shows that it was Mr. Tedrow who told Dr. Higginbotham that he received testosterone supplementation. Whatever evidence Mr. Tedrow has that Ms. Britt spread the rumor as truth, he hasn't brought it to the court's attention.

The record would allow a factfinder to conclude that the administrators shared the existence of the steroid rumor with each other without adopting the rumors as their own or attesting to the veracity of the rumors. A factfinder could also conclude that Dr. Pettet told Mr. Tedrow that his voice and muscles were intimidating. It's undisputed for summary judgment purposes that Ms. Britt didn't spread any rumors of steroid use to the fitness-for-duty examiner because that assertion is unsupported by any citation to the record. *See* Fed. R. Civ. P. 56(e).

Resolving factual disputes in Mr. Tedrow's favor wouldn't allow a reasonable jury to conclude that the alleged harassment was so objectively reasonable as to alter the terms of Mr. Tedrow's employment, so the School Corporation is entitled to summary judgment. Principal Morris acted reasonably when she told Ms. Britt and Dr. Pettet about the steroid rumors. Principal Morris was a school administrator dealing with conflict among staff. A reasonable supervisor or human resources professional would apprise their colleagues of the nature of the conflict among their staff, including the existence of rumors. Indeed, it would seem less reasonable for Principal Morris, Ms. Britt, and Dr. Pettet to have put their heads in the sand and ignored that Mr. Tedrow's colleagues were speculating that he was using steroids. If he used steroids,

they'd want to deal with his steroid use, and if he didn't, they'd want to tamp down on rumors among the staff. It would defy common sense to forbid a principal and human resources officers from discussing these matters.

Mr. Tedrow's account, that his administrators maliciously spread as fact that he was using steroids, might support a hostile work environment claim. That view isn't supported by evidence, even viewed favorably to Mr. Tedrow. The evidence supports that the administrators told each other about the existence of a rumor, actions that are eminently reasonable.

Nor were Dr. Pettet's statements objectively unreasonable. The record viewed most favorably to Mr. Tedrow — his statement to the school board accusing Dr. Pettet of telling him that his muscles and voice intimidated his colleagues — would support that Dr. Pettet told Mr. Tedrow that his muscles and voice were intimidating. This is at most offensive. Even though Mr. Tedrow has evidence that he was personally anguished, that evidence goes only to subjective severity and doesn't show conduct so severe or pervasive as to alter Mr. Tedrow's conditions of employment.

Finally, the failure of Principal Morris and Ms. Britt to follow up on Mr. Tedrow's complaints of sex discrimination didn't create an objectively hostile work environment. The evidence viewed in Mr. Tedrow's favor reveals one episode of aggression from Ms. Eck and Principal Morris's failure to follow up on a complaint from Mr. Tedrow. A single incident must be extraordinarily egregious to constitute harassment. *See* EEOC v. Mgmt. Hosp. of Racine, Inc., 666 F.3d 422, 432–433 (7th Cir. 2012). Mr. Tedrow hasn't shown or explained how not

following up on a single complaint of discrimination was so severe and pervasive as to effectively change the conditions of Mr. Tedrow's employment.

A jury could find that Mr. Tedrow subjectively felt that his workplace had become hostile because of his sex. But harassment is actionable only if it makes a hostile work environment both objectively and subjectively unreasonable. Kampier v. Emeritus Corp., 472 F.3d 930, 941 (7th Cir. 2007). The record viewed most favorably to Mr. Tedrow wouldn't permit a reasonable factfinder to conclude that the workplace was objectively hostile. The court accordingly grants the School Corporation's motion for summary judgment and denies Mr. Tedrow's motion for summary judgment as to his Title VII harassment claim.

### F.  Title VII Retaliation

Mr. Tedrow claims the School Corporation retaliated against him in violation of Title VII. Both he and the School Corporation move for summary judgment on his Title VII retaliation claim.

Title VII's antiretaliation provision makes it unlawful for an employer to retaliate against an employee who engaged in protected activity. 42 U.S.C. § 2000e-3(a). Protected activity includes opposing activity that Title VII makes unlawful or participating in any investigation into unlawful practices. Id. Title VII's retaliation provision is meant to give employees full access to remedies by prohibiting employers from discouraging or preventing complaints about unlawful activity. Robertson v. Wis. Dep't of Health Servs., 949 F.3d 371, 378

(7th Cir. 2020) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).

To prove retaliation, a plaintiff must show that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered an adverse employment action; and (3) that the protected activity was the but-for cause of the employment action. <u>Id.</u> While a plaintiff claiming discrimination must prove that an adverse employment action materially affected the terms and conditions of work, a plaintiff claiming retaliation "must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." <u>Chaib v. Indiana</u>, 744 F.3d 974, 986–987 (7th Cir. 2014) (quoting <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. at 68). An adverse employment action is judged "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Robertson v. Wis. Dep't of Health Servs.</u>, 949 F.3d at 372 (citations and quotations omitted).

Once a plaintiff makes a prima facie case of retaliation, an employer can defeat the claim with evidence that would allow a reasonable factfinder to conclude that the employer had a legitimate nondiscriminatory reason for its action. <u>Id.</u> at 378. The burden then shifts back to the plaintiff, who must produce evidence that would allow a jury to find, by a preponderance of the evidence, that the employer's stated reason was pretextual. <u>Id.</u> An employer's stated reason isn't pretextual because it's inaccurate or unfair; the "sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." <u>Id.</u>

Mr. Tedrow says in his brief that he relies on each of the adverse employment actions that he identified in his discrimination and harassment claims. [Doc. 126 at 30]. Immediately after claiming that those several adverse employment actions support a retaliation claim, he only discusses how two of the School Corporation's actions were caused by his protected activity, so the court only considers those actions.

First, Mr. Tedrow filed a charge alleging sex discrimination with the EEOC on November 22, 2019, and then received a preliminary notice of termination on December 4, 2019. He argues that this suspicious timing shows that the School Corporation's decision to start the termination process was retaliatory because of his complaint of sex discrimination.

The School Corporation argues that it had a legitimate nondiscriminatory reason for starting termination: Mr. Tedrow didn't comply with the fitness-for-duty exam, showing insubordination and resulting in an inconclusive result. According to record evidence, Dr. Higginbotham told Ms. Britt on October 22 that he couldn't complete the assessment because Mr. Tedrow prevented his providers from sharing information, cancelled a meeting with Dr. Higginbotham, and provided little information about himself during testing. Ms. Britt sent Mr. Tedrow a letter three days later telling him that his noncooperation inhibited the examination and gave until November 8 to reinstate his medical releases. Mr. Tedrow responded by requesting more information as to why the School Corporation wanted an exam at all and why it needed the releases, to which Ms. Britt responded on November 15, explaining coworkers' concerns and repeating

42

that the examiner couldn't get medical information from Mr. Tedrow's providers without the releases. She gave Mr. Tedrow an extra week, telling him that he had until November 22 to comply with the request for information and release, and cautioning that failure to comply would be considered insubordination and would subject Mr. Tedrow to discipline including termination. Mr. Tedrow requested another extension on November 20 and Mr. Britt granted it, giving Mr. Tedrow until November 27 to respond.

In the meantime, Mr. Tedrow filed his EEOC charge on November 22, alleging sex and disability discrimination and retaliation. About a week and a half later, Principal Morris sent Mr. Tedrow a letter informing him of her preliminary decision to cancel his teaching contract for insubordination and "lack of fitness to perform the essential functions of [his] teaching position" [Doc. 38-6]. According to the School Corporation, the evidence points in one direction: Principal Morris initiated termination proceedings because of Mr. Tedrow's insubordination and inconclusive exam.

When an employer produces evidence of a legitimate nondiscriminatory reason for its actions, The "sole focus" is whether the legitimate nondiscriminatory purpose was a "falsehood" rather than "an honestly held belief." Robertson v. Wis. Dep't of Health Servs., 949 F.3d at 378. Mr. Tedrow suggests that the timing between his EEOC charge and the preliminary determination is suspicious but doesn't otherwise respond to the School Corporation evidence the School Corporation initiated termination proceedings because of the fitness-for-duty exam rather than the EEOC charge. Without

43

evidence of pretext, Mr. Tedrow can't hang his hat on Principal Morris's preliminary notice of termination for his retaliation claim. There's no genuine issue as to causation between the EEOC charge and termination proceedings.

Second, Mr. Tedrow claims that Dr. Pettet's recommendation of termination based on the "last chance agreement" was retaliation. On December 13, 2019, Dr. Pettet offered to withhold recommending termination if Mr. Tedrow dismissed his pending EEOC charge and agreed to switch schools. Then on December 17, Dr. Pettet emailed Mr. Tedrow summarizing the conference. He included the last chance agreement that memorialized the terms of his offer. It said, among other things, that Mr. Tedrow would release and waive "all legal and equitable claims, liabilities, and causes of action . . . that arise out of his employment with [the School Corporation] and his resignation therefrom." [Doc. 22-1 at 2]. The last chance agreement would allow the School Corporation to terminate Mr. Tedrow if he violated the agreement and expressed an "intention that this release be construed as broadly as possible under the law." Id.

Mr. Tedrow contends that recommending termination after Mr. Tedrow rejected the last chance agreement was retaliation because opposing the agreement was protected activity. The agreement would put him in a dilemma — either give up his Title VII claims and keep his job or keep his Title VII claims and give up his job. The written agreement would permit the School Corporation to terminate Mr. Tedrow if he engaged in activity protected under Title VII in the future. So when Mr. Tedrow declined the agreement because of the waiver

44

provision and Dr. Pettet recommended that he be terminated, the School Corporation retaliated against Mr. Tedrow.

This claim finds support in a theory of anticipatory retaliation, as explained and applied in EEOC v. Cognis Corp., No. 10-CV-2182, 2011 U.S. Dist. LEXIS 142334, at *21–28 (C.D. Ill. Dec. 12, 2011). In EEOC v. Cognis Corp., the employer offered last chance agreements requiring employees to refrain from engaging in statutorily protected activity. If the employee later engaged in protected activity, the employee was subject to immediate termination. The court reasoned that even though Title VII doesn't explicitly prohibit threats of retaliation, precedent and logic required applying the antiretaliation provision to threats. Id. at *21–23. The court cited the goal of "[m]aintaining unfettered access to statutory remedial mechanisms," id. at *21 (citing Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)), as well as circuit precedent suggesting that the threat of retaliation is tantamount to retaliation under Title VII. Id. at *24 (citing Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 624 (7th Cir. 2002)). Acknowledging that waiver of preexisting claims is generally permissible, the court concluded that a last chance agreement that makes future employment contingent on refraining from protected activity would deter employees from engaging in statutorily protected activity, so is retaliation. Id. at 26–28.

The School Corporation disputes the scope of the agreement. It claims that Dr. Pettet wanted Mr. Tedrow to waive only his past claims, as supported by Dr. Pettet's testimony. The written agreement demonstrates this, too, according to the School Corporation — "[t]he last two sentences of paragraph three of the [last

chance agreement] make clear that waiver applied to existing claims only." [Doc. 131 at 45]. That portion says that Mr. Tedrow would have to dismiss his EEOC charge within two days.

The agreement's scope isn't so easily resolved in the School Corporation's favor. Dr. Pettet claimed and his emails show that he wanted Mr. Tedrow to dismiss only his pending EEOC charge. The written offer would require that Mr. Tedrow waive all claims "that arise out of his employment with [the School Corporation] and his resignation therefrom." The more specific language requiring dismissal of pending claims doesn't limit the broader language requiring waiver of all claims through Mr. Tedrow's eventual resignation, contrary to the School Corporation's insistence that the written agreement only considered past claims. [6] The written agreement contemplates termination for future protected activity.

A fact dispute therefore exists as to the scope of the agreement Dr. Pettet intended to propose, which in turn creates a fact dispute over causation. A factfinder might credit Dr. Pettet, believe that the written language didn't reflect the offer he made to Mr. Tedrow in person, and conclude that Dr. Pettet intended a last chance agreement that waived only past claims. The factfinder could

---

[6] The last chance agreement's reference to Mr. Tedrow's resignation seems to come out of the blue since Mr. Tedrow wasn't resigning. A possible explanation is that the School Corporation repurposed a form contract typically used for severance agreements and didn't fully modify the agreement for Mr. Tedrow. But that's not an argument the School Corporation pressed, and even if it were, it isn't a fact that the court could resolve at summary judgment.

conclude that Dr. Pettet's recommendation was because he thought Mr. Tedrow refused to waive past claims, not future claims. Dr. Pettet then wouldn't have acted because of Mr. Tedrow's protected activity. On the other hand, a factfinder might credit Mr. Tedrow's evidence, discredit Dr. Pettet, and conclude that the written agreement matched what Dr. Pettet proposed. That factfinder could conclude that Dr. Pettet recommended termination because Mr. Tedrow refused to waive *future* Title VII claims. Whether Dr. Pettet recommended termination because of Mr. Tedrow's refusal to waive future Title VII rights (which is protected activity, *see* EEOC v. Cognis Corp., 2011 U.S. Dist. LEXIS 142334, at *22–28) or because he refused to waive only past claims (which might be reasonable, *see* Isabell v. Allstate Ins. Co., 418 F.3d 788, 793 (7th Cir. 2005)) can't be resolved at summary judgment.

The School Corporation disputes Mr. Tedrow's claim on two other fronts. It argues that Dr. Pettet had decided to recommend Mr. Tedrow's termination before offering the last chance agreement, so protected activity didn't cause Dr. Pettet's recommendation. That argument is illogical. If Dr. Pettet was going to recommend termination regardless of the last chance agreement, he wouldn't have offered it in the first place. Dr. Pettet told Mr. Tedrow he'd withhold his termination recommendation if Mr. Tedrow agreed to the last chance agreement, so the School Corporation can't claim the agreement had nothing to do with Dr. Pettet's decision at all.

Second, the School Corporation contends that Dr. Pettet didn't fire and couldn't fire Mr. Tedrow, so there was no materially adverse employment action.

While Dr. Pettet's recommendation wasn't materially adverse for Title VII discrimination, the "adverse employment action required for a retaliation claim is lower than that required for a discrimination claim; a plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." Chaib v. Indiana, 744 F.3d 974, 986–987 (7th Cir. 2014) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). A reasonable teacher might be dissuaded from opposing a future-claim waiver if the consequence is facing the school board for termination proceedings. This is yet another issue for a factfinder.

The court grants the School Corporation's motion for summary judgment and denies Mr. Tedrow's motion as to the claim that the School Corporation retaliated against him for his EEOC charge. The court denies both parties' motions for summary judgment on Mr. Tedrow's claim that the School Corporation retaliated against him for refusing to assent to the last chance agreement.

## G. ADA Discrimination

Mr. Tedrow claims the School Corporation violated the ADA by discriminating against him because of his disabilities and by requesting overbroad medical releases and demanding impermissible medical exams. Mr. Tedrow and the School Corporation both move for summary judgment on his disability discrimination claim.

The Americans with Disabilities Act prohibits employment discrimination based on an employee's disability. 42 U.S.C. § 12112(a). A plaintiff claiming disability discrimination must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations; (3) he suffered an adverse employment action; and (4) his disability caused the adverse employment action. Kurtzhals v. Cnty. of Dunn, 969 F.3d 725, 728 (7th Cir. 2020). As with Title VII claims, an adverse employment action must be materially adverse, and not minor or trivial. Id. (citing O'Neal v. City of Chi., 392 F.3d 909, 911 (7th Cir. 2004)). A plaintiff must show that his disability was the but-for cause of the adverse employment action: "could a reasonable juror conclude that he would not have suffered the same adverse employment action if he were not disabled and everything else had remained the same?" Id. (citing Graham v. Arctic Zone Iceplex, LLC, 930 F.3d 926, 929 (7th Cir. 2019) (quoting Ortiz v. Werner Enters., Inc., 834 F.3d 760, 764 (7th Cir. 2016))).

Mr. Tedrow claims, and the School Corporation doesn't dispute, that Mr. Tedrow had body dysmorphia and anxiety disorder. Mr. Tedrow claims he was a qualified individual for the School Corporation's teaching jobs and that the School Corporation discriminated against him because of his disability. He refers to the same adverse employment actions that he relies on for his Title VII discrimination claim and claims that each was because of his disability.

The School Corporation argues that it's entitled to summary judgment for some of the same reasons it argued as to Mr. Tedrow's Title VII discrimination

claim. First, it argues Mr. Tedrow wasn't meeting legitimate expectations because of allegations of aggressive and inappropriate behavior. Second, no employment action was materially adverse for purposes of the ADA. Third, Mr. Tedrow can't show that a non-disabled comparator was treated better. Fourth, having failed to make a prima facie case of discrimination, Mr. Tedrow also can't show pretext. Mr. Tedrow reiterates the same arguments in response for his ADA discrimination claim as he did for his Title VII claim.

For the same reasons as with Mr. Tedrow's Title VII claim, none of the employment actions Mr. Tedrow points to was materially adverse, so his ADA discrimination claim can't rest on those actions. But the School Corporation is also entitled to summary judgment on causation. Mr. Tedrow asserts that the defendants knew he had anxiety disorder before ordering the fitness-for-duty exam, so it's "self-evident" that the School Corporation took adverse employment actions because of his disability. Mr. Tedrow doesn't explain why he sees that as self-evident — he doesn't explain how the School Corporation's knowledge of his anxiety disorder or body dysmorphia proves that it acted *because of* his anxiety disorder, nor offers other evidence that his anxiety disorder or body dysmorphia was the but-for cause of any alleged adverse employment action. On the other hand, the School Corporation has undisputed evidence that it ordered the exam because of coworkers' complaints about Mr. Tedrow's conduct. Mr. Tedrow doesn't show or explain how that reason for any of the actions was pretextual.[7]

---

[7]     Mr. Tedrow characterizes the School Corporation's appeals to coworker complaints as a "direct threat" defense, and argues the defense fails because it

The School Corporation is entitled to summary judgment because there's no genuine issue as to a materially adverse employment action or as to causation. The court need not address the School Corporation's other arguments about whether Mr. Tedrow was a qualified individual, was meeting expectations, or has comparators, so it doesn't reach those arguments.

Mr. Tedrow also brings a discrimination claim based on the ADA's prohibition against certain medical examination and inquiries. The ADA includes "medical examinations and inquiries" in its definition of discrimination. *See* 42 U.S.C. § 12112(d)(1). An employer "shall not require a medical examination [or] make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." Id. § 12112(d)(3). An employer must show business necessity, more than mere business expediency or convenience. Wright v. Ill. Dep't of Child. & Fam. Servs., 798 F.3d 513, 523 (7th Cir. 2015). An employer can inquire into an

---

requires that the employer have objective medical evidence that an employee poses a direct threat to others. *See* 29 C.F.R. § 1630.2(r). That defense and its requirement of objective medical evidence comes into play when an employee claims that application of qualification standards and a failure to accommodate results in discrimination. 42 U.S.C. § 12113(a), (b); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 170–171 (2d Cir. 2006). Mr. Tedrow doesn't advance claims based on qualification standards and failure to accommodate, so the School Corporation's stated reasons aren't a "direct threat" defense and a lack of objective medical evidence doesn't undermine those reasons.

employee's psychiatric health if it reflects a concern for the safety of coworkers or the public. Id.

Mr. Tedrow argues that the fitness-for-duty exam and the medical releases he had to sign weren't job-related or consistent with business necessity. He claims the psychological fitness-for-duty exam covered mental health history and drug and alcohol use, which were unrelated to any job duties. Nor was the exam related to business necessity, according to Mr. Tedrow, because the School Corporation didn't identify any functions he couldn't perform. He argues that the exam and medical requests were overbroad, so violated the ADA. See Nawara v. Cnty of Cook, 2021 U.S. Dist. LEXIS 59509, at *41–43 (N.D. Ill. Mar. 28, 2021).

Mr. Tedrow also urges the court to grant summary judgment in his favor because a district court evidently found similar requests for information to violate the ADA. The case, EEOC v. Cummins Power Generation, Inc., 313 F.R.D. 93 (D. Minn. 2015), dealt with claims under Title VII, the ADA, and GINA and allegations of overbroad releases of medical information. Mr. Tedrow claims the facts were indistinguishable from his and that the court found for the plaintiff, explaining that "[l]ike Title VII, both the ADA and GINA make it an employer's responsibility to ensure fitness-for-duty exams are conducted in a nondiscriminatory way." [Doc. 126 at 27]. He cites an EEOC press release to suggest that the court resolved the claims unequivocally in the employees' favor:

> Cummins Power Generation, Inc. violated the Americans with Disabilities Act (ADA) and the Genetic Information Nondiscrimination Act (GINA) when it required an employee to sign an overbroad release of medical records to take a fitness-for-duty examination . . . and then fired him when he objected to the breadth of the release.

Id. (citing Press Release, Equal Employment Opportunity Commission, Cummins Power Generation to Pay Over $87,000 to Resolve EEOC Disability Lawsuit (May 9, 2016), https://www.eeoc.gov/newsroom/cummins-power-generation-pay-over-87000-resolve-eeoc-disability-lawsuit (last visited May 23, 2023)).

Mr. Tedrow's characterization of EEOC v. Cummins Power Generation is troubling at best. He suggests that the court found the employer liable for unlawful medical releases, but the case says no such thing. The court addressed motions for judgment on the pleadings on the defense that the plaintiffs didn't join indispensable parties. EEOC v. Cummings Power Generation Inc., 313 F.R.D. at 95. The court said explicitly, "To be clear, at this stage of proceedings, the Court makes no determination whether either form in fact violates the ADA or GINA. Such a determination is not necessary to resolve the issue [about indispensable parties] presently before the Court." Id. at 99 n.10. Mr. Tedrow's citation to the press release further implies that the court found the defendant liable. The press release, however, describes the later resolution of the case with a consent decree. His quotation of the press release bolsters his implication of a finding of liability by saying that the defendant "violated the Americans with Disabilities Act (ADA) and the Genetic Information Nondiscrimination Act (GINA) when it required an employee to sign an overbroad release of medical records to take a fitness-for-duty examination." He omits two important words preceding that quotation: "EEOC said." The EEOC described its own allegations in its press release and was not summarizing the findings of a judge or jury. Mr. Tedrow doubles down in his reply/response brief, claiming his situation to be

indistinguishable from EEOC v. Cummins Power Generation. [Doc. 132 at 25]. Mr. Tedrow's claim of disability discrimination finds no support in EEOC v. Cummins Power Generation. The court is obliged to take this opportunity to remind Mr. Tedrow's attorney of the attorney's duty of candor to the tribunal; the characterization of the holding and press release suggest that counsel briefly lost touch with that ethical responsibility.

The School Corporation argues that there's no dispute over the limited scope and justification of the medical inquiries and examinations. It contends that Mr. Tedrow's aggressive behavior that disturbed his coworkers justified the exam and related inquiries; colleagues' complaints that Mr. Tedrow was repeatedly aggressive and inappropriate with them and acted aggressively toward young students gave the School Corporation good reason to think Mr. Tedrow couldn't perform basic functions of the job, like getting along with others. Handling reasonably necessary stress and working reasonably with others are essential functions of any job. Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002) (citing Palmer v. Cir. Ct. of Cook Cnty., 117 F.3d 351 (7th Cir. 1997) (discussing the ADA)). The record further shows that the alleged behavior caused several teachers and instructional assistants to refuse to work with Mr. Tedrow.

The School Corporation then emphasizes that the inquiries and examinations weren't overly broad. The medical release forms had space for Mr. Tedrow to limit the scope of the releases, and he didn't use the space before or after revoking the releases. The School Corporation also points to the fitness-for-

duty examiner's inquiries to Mr. Tedrow's providers. In one letter to Mr. Tedrow's psychiatrist, the examiner limited his questions to Mr. Tedrow's mental health diagnoses, information about mental health drugs, treatment history of mental health disorders, and whether Mr. Tedrow had told the psychiatrist about his coworkers' concerns. [Doc. 125-6 at 3].

The School Corporation's inquiries and examination didn't run afoul of the ADA, so the School Corporation is entitled to summary judgment. The ADA prohibits employers from "requir[ing] a medical examination [or making] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The School Corporation has shown that the inquiries and examination were job-related and consistent with business necessity. Colleagues' complaints gave the School Corporation good reason to think Mr. Tedrow was aggressive and intimidating to students and coworkers alike, in contrast to his formerly professional demeanor. Mr. Tedrow insists that the School Corporation never identified essential functions of the job that he couldn't do, but the record shows that the School Corporation was concerned with his ability to get along with others, and that administrators told him of that very concern. Mr. Tedrow implies that the School Corporation needed to identify teacher-specific job functions and that getting along with others isn't a job function, but getting along with others is an essential function. *See* Williams v. Motorola, Inc., 303 F.3d at 1290. Staff had also begun to refuse to work with Mr.

Tedrow. Coworkers' concerns with their safety and the safety of students elevated the School Corporation's concern from concern over mere "annoyance" or inefficiency to business necessity. *See* Wright v. Ill. Dep't of Child. & Fam. Servs., 798 F.3d 513, 523–524 (7th Cir. 2015). These concerns provide business necessity for the medical exams and Mr. Tedrow doesn't show that these reasons were made in bad faith or pretextual, even if he disputes the veracity of some of the complaints.

Nor were the actual medical inquiries overbroad. Mr. Tedrow places great stock in the medical releases because they would authorize his medical providers to provide his entire medical file to Dr. Higginbotham. The medical releases would authorize the providers to give Mr. Tedrow's entire medical file to Dr. Higginbotham if he asked for it, but he never made so broad a request. The only inquiries Mr. Tedrow points to on the record related to the School Corporation's concerns of a medical cause of Mr. Tedrow's perceived change in behavior. Dr. Higginbotham asked about mental health diagnoses, prescription drugs related to mental health, history of mental illness, testosterone treatment, and comments about behavior with coworkers. [Doc. 125-6 at 3]. No evidence shows that Dr. Higginbotham made any actual request that went beyond what was job related.

The School Corporation has shown that its examination and inquiries were job-related and consistent with business necessity, so it's entitled to summary judgment on that claim.

*H. ADA Harassment*

Mr. Tedrow claims the School Corporation created a hostile work environment based on disability. Harassment in the form of hostile work environment is actionable under the ADA. Ford v. Marion Cnty. Sheriff's Off., 942 F.3d 839, 851 (7th Cir. 2019). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Mr. Tedrow combines discussion of ADA discrimination and ADA harassment in his opening brief. He argues why the School Corporation's actions amounted to a discrimination claim based on adverse employment actions and overbroad medical releases, explained earlier. He doesn't identify which actions added to hostile work environment or explain how the discrete alleged adverse employment action fit into a hostile work environment claim. The School Corporation seems to think Mr. Tedrow's hostile work environment claim is based on the fitness-for-duty exam and medical releases and argues that neither was objectively unreasonable. Mr. Tedrow later refers to disability harassment in his reply/response brief but again focuses only on discrimination claims and doesn't address how any of the School Board's actions created a hostile work environment based on disability.

Mr. Tedrow's attempts to turn ADA discrimination claims into a hostile work environment claim are underdeveloped. He focuses on adverse employment

action claims without addressing how his workplace was "permeated with discriminatory intimidation, ridicule, and insult [] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Ford v. Marion Cnty. Sheriff's Off., 942 F.3d at 851 (citing Harris v. Forklift Sys., 510 U.S. at 21). He appears to have abandoned the claim. There's no genuine issue as to whether Mr. Tedrow was made to endure a hostile work environment based on disability, so the court grants summary judgment in the School Corporation's favor on Mr. Tedrow's ADA harassment claim.

## I.   ADA Retaliation

Mr. Tedrow claims the School Corporation violated the ADA by retaliating against him. The ADA prohibits retaliation for statutorily protected activity. 42 U.S.C. § 12203(a). A plaintiff claiming ADA retaliation must show that: (1) he engaged in activity protected by the ADA; (2) he suffered an adverse employment action; and (3) the protected activity caused the adverse employment action. Squibb v. Mem'l Med. Ctr., 497 F.3d 775, 786 (7th Cir. 2007). An employment action is sufficiently adverse for retaliation if it would dissuade a reasonable employee from participating in protected activity. Chaib v. Indiana, 744 F.3d 974, 986–987 (7th Cir. 2014).

Mr. Tedrow claims that he first engaged in statutorily protected activity when he revoked his medical releases. The ADA prohibits medical inquiries or exams that aren't job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(1). He claims to have opposed the exams because he thought they

were overbroad. Then he later filed his charge with the EEOC alleging ADA discrimination. When the School Corporation initiated termination proceedings, according to Mr. Tedrow, it retaliated against him for opposing unlawful medical releases and for alleging ADA discrimination with the EEOC.

The School Corporation claims it had a legitimate nondiscriminatory reason for any action against Mr. Tedrow, so it's entitled to summary judgment. Its legitimate nondiscriminatory reason is the same it raised with Mr. Tedrow's Title VII retaliation claim — it initiated termination proceedings because of Mr. Tedrow's insubordination and inconclusive fitness-for-duty exam, not for any protected activity. The School Corporation explains that it warned Mr. Tedrow repeatedly that if he failed to cooperate with the fitness-for-duty examiner by providing releases of medical information, the exam would be inconclusive. He only filed an EEOC charge after the School Corporation offered one final extension of time to furnish the releases, so his EEOC charge can't be said to have caused any adverse employment action.

Having provided a legitimate nondiscriminatory reason, the School Corporation is entitled to summary judgment unless Mr. Tedrow can "provide evidence that he was fired for reasons other than those provided, the reasons had no grounding in fact, or were insufficient to warrant termination." Castetter v. Dolgencorp, LLC, 953 F.3d 994, 997 (7th Cir. 2020).

At first blush, the School Corporation's stated reason and Mr. Tedrow's protected activity appear to make a thorny fact issue. The School Corporation claims to have acted because of insubordination and an inconclusive exam, but

Mr. Tedrow was only insubordinate and didn't cooperate with the exam because the thought doing so would violate the ADA. Unlike with Mr. Tedrow's Title VII claim, where opposition to the medical releases was unrelated to sex, Mr. Tedrow's opposition to the whole process was related to disability and the ADA. A factfinder might have to sort out whether Mr. Tedrow's opposition to overbroad releases or mere insubordination caused an adverse employment action.

But the thorns fall away because Mr. Tedrow lacks evidence that the School Corporation knew he was engaging in protected activity. "A valid retaliation claim requires that the decisionmaker knew of the protected activity." Kotasks v. Fed. Express Corp., 966 F.3d 624, 633 (7th Cir. 2020). Mr. Tedrow shows that the school administrators knew that Mr. Tedrow revoked his medical releases and refused to reinstate them but offers no evidence that they knew why he did so. Mr. Tedrow claims throughout his briefs that he opposed the medical releases because he thought they were overbroad. Nowhere in his briefs does he point to evidence that he ever expressed this belief to the School Corporation. He cites to evidence that Ms. Britt knew that Mr. Tedrow revoked his releases and offered extension of time after urging Mr. Tedrow to comply. He cites the School Corporation's response to a request for admission in which it admitted to knowing that Mr. Tedrow revoked the releases but didn't admit to knowing that he thought they were unlawful. None of this evidence shows that the School Corporation knew that Mr. Tedrow opposed its actions as unlawful under the ADA.

Mr. Tedrow finally cites many materials in his reply/response brief that he opposed the medical records as a discriminatory practice, but none support his claim.[8]

Mr. Tedrow's assertion that the School Corporation retaliated against him for opposing the medical releases presupposes that the School Corporation knew that he revoked the medical releases because he believed them to be unlawful. Mr. Tedrow doesn't support that assertion with any record evidence, so it's undisputed for summary judgment that the School Corporation didn't know Mr. Tedrow's reasons for revoking his medical releases and refusing to reinstate them. *See* Fed. R. Civ. P. 56(e).

The record supports the School Corporation knew Mr. Tedrow revoked the medical releases, but Mr. Tedrow provides no evidence the School Corporation had reason to believe the revocations had anything to do with the ADA. That leaves the School Corporation's legitimate nondiscriminatory reasons

---

[8]     Mr. Tedrow cites evidence in a footnote that directs the reader to footnote 84 on page 21 of his reply/response brief. [Doc. 132 at 26]. Footnote 84 (on page 22, not page 21) cites two things: his brief in opposition to the defendants' motion to dismiss and evidence of Ms. Britt's refusal to provide an employment reference. It doesn't point to evidence of protected activity. The three footnotes on page 21 (perhaps footnote 84 was a clerical mistake and the citation to page 21 was correct) point to several other footnotes rather than citing the record. Footnote 82 cites yet another footnote citing evidence that Ms. Britt urged Mr. Tedrow to comply and that the School Corporation admitted to knowing Mr. Tedrow revoked his releases. Footnotes 81 and 83 don't cite the record but cite fifteen other footnotes. Those fifteen other footnotes contain around twenty-five record citations, none of which appear to show that the School Corporation knew Mr. Tedrow opposed the medical releases because of their overbreadth rather than any other reason. Mr. Tedrow cites other correspondences between his medical providers and the fitness-for-duty examiner, but those correspondences don't show what the School Corporation's decisionmakers knew.

unrebutted. The School Corporation presented evidence that Principal Morris and Dr. Pettet acted because of their belief that Mr. Tedrow was insubordinate and had an inconclusive fitness-for-duty exam, not because he opposed an action unlawful under the ADA.

Similarly, no reasonable factfinder could conclude that Mr. Tedrow's EEOC charge caused an any retaliatory act. As with Mr. Tedrow's Title VII retaliation claim, Ms. Britt repeatedly warned Mr. Tedrow that failure to complete the fitness-for-duty exam would result in discipline including termination. Mr. Tedrow hasn't shown that the School Corporation knew that his noncooperation was opposition to unlawful activity under the ADA nor does he rebut that the School Corporation's true reason was his insubordination. The School Corporation is entitled to summary judgment on Mr. Tedrow's ADA retaliation claim. The court grants the School Corporation's motion and denies Mr. Tedrow's motion as to any ADA retaliation claim.

### J.  GINA Discrimination

Mr. Tedrow claims that the School Corporation discriminated and retaliated against him in violation of the Genetic Information Nondiscrimination Act. That Act generally prohibits employers from discriminating against an employee "because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a). Genetic information includes the employee's genetic tests, genetic tests of the employee's family members, and the manifestation of a disease or disorder in the employee's family members. Id. § 2000ff(4)(A). GINA

also prohibits employers from retaliating against employees for opposing any act or practice that GINA makes unlawful. Id. § 2000ff-6(f).

Mr. Tedrow argues he's entitled to summary judgment because the School Corporation didn't include language from an EEOC final rule in its requests for information. A final rule from the EEOC interpreting GINA provides a safe harbor for employers who inadvertently require or request genetic information. 29 C.F.R. § 1635.8(b)(1)(i)(B). An unlawful requirement or request is considered inadvertent if the employer includes in the requirement or request specific language explaining that the employer doesn't seek to collect genetic information.[9] Id.

The School Corporation moves for summary judgment on this claim. First, the School Corporation argues that it never received genetic information. Mr. Tedrow gave the School Corporation medical information, but GINA defines "genetic information" as genetic tests, a family member's genetic tests, or the

---

[9]     The rule reads in full, "If a covered entity uses language such as the following, any receipt of genetic information in response to the request for medical information will be deemed inadvertent: The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.'" 29 C.F.R. § 1635.8(b)(1)(i)(B).

manifestation of a disease or disorder in the employee's family members. 42 U.S.C. § 2000ff(4)(A). No evidence shows that the information he submitted included "genetic information." Then, the School Corporation argues that it couldn't have discriminated against Mr. Tedrow based on his genetic information because it had no genetic information with which to discriminate. *Cf.* Pourghoraishi v. Flying J., Inc., 449 F.3d 751, 759 (7th Cir. 2006) (defendant without knowledge of plaintiff's race couldn't have intended to discriminate by race under 42 U.S.C. § 1981). Finally, the School Corporation argues that Mr. Tedrow simply gets the EEOC rule wrong — the safe-harbor rule acts to absolve certain employers of liability, not to independently impose liability on employers.

Mr. Tedrow replies that the School Corporation didn't rebut his facts about the safe harbor, that is, his assertion that the safe-harbor provision is mandatory and imposes liability on those who don't include its language in requests for information.

The School Corporation has established that there's no genuine issue of material fact as to discrimination under GINA, so it's entitled to summary judgment. GINA protects employees from discrimination because of genetic information. Mr. Tedrow presents evidence that the School Corporation requested medical information, but Mr. Tedrow doesn't present evidence that any of that information fits GINA's definition of genetic information. Nor does he explain how receiving non-genetic medical information would somehow violate GINA.

The safe-harbor provision doesn't show liability. The safe harbor absolves employers from liability when an unlawful requirement or request for genetic information is inadvertent. 29 C.F.R. § 1635.8(b)(1)(i)(B) ("If a covered entity uses language such as the following, any receipt of genetic information . . . will be deemed inadvertent."). The same rule clarifies that an employer can show that its action was inadvertent even if it doesn't include the specific language. Id. § 1635.8(b)(1)(i)(C) ("A covered entity's failure to give such a notice or to use this or similar language will not prevent it from establishing [inadvertence]."). The rule doesn't impose liability on an employer who omits the prescribed language. In sum, Mr. Tedrow's assertion that the EEOC rule mandates employers to include certain disclaimers is unsupported. He cites 29 C.F.R. § 1635.8(b)(1)(i)(B), but that section of the Code of Federal Regulations doesn't include such a requirement. The court grants the School Corporation's motion for summary judgment and denies Mr. Tedrow's as to his discrimination claim under GINA.

### K.  GINA Retaliation

The parties each move for summary judgment on Mr. Tedrow's GINA retaliation claim. An employer unlawfully retaliates by discriminating against employees for opposing any act or practice that GINA makes unlawful. Id. § 2000ff-6(f).

Mr. Tedrow's argument in support of his GINA retaliation claim is hard to assemble. He claims the School Corporation notified him of his termination after

the inconclusive fitness-for-duty exam, that his own providers told the School Corporation he was fit for duty, that Dr. Pettet read and reviewed the letters "before firing [Mr.] Tedrow," so the School Corporation retaliated against him in violation of GINA. [Doc. 126 at 28].

The School Corporation contends it's entitled to summary judgment because Mr. Tedrow didn't suffer any adverse employment action for GINA-protected activity and because Mr. Tedrow can't show that any protected activity caused an adverse employment action. Mr. Tedrow's reply mixes arguments as about GINA discrimination and GINA retaliation. He ultimately addresses retaliation only by claiming that he opposed the School Corporation's demand for a year's worth of medical records and filed an EEOC charge, resulting in termination proceedings.

As with Mr. Tedrow's ADA retaliation claim, Mr. Tedrow doesn't present evidence that would allow a factfinder to conclude that any GINA-protected activity caused any adverse employment action. Mr. Tedrow presents evidence that he opposed the releases but doesn't present evidence that he revoked the releases or otherwise objected to them because they might include genetic information. He didn't include a GINA claim in his first EEOC charge filed weeks before termination proceedings and doesn't explain how he was retaliated against for his later EEOC charge. The second EEOC charge included GINA claims but wasn't filed until August 10, 2020.

Finally, as much as he relies on EEOC v. Cummins Power Generation, 313 F.R.D. 93 (D. Minn. 2015), any argument fails because that case didn't hold that

any request for medical information is a per se violation of GINA, as explained earlier. To the extent that any other combination of events supports a GINA retaliation claim, Mr. Tedrow doesn't construct those arguments, so the court doesn't construct them for him. *See* <u>Nelson v. Napolitano</u>, 657 F.3d 586, 590 (7th Cir. 2011) ("[Courts aren't] "obliged to research and construct legal arguments for parties, especially when they are represented by counsel.")

No reasonable jury could find that the School Corporation retaliated against Mr. Tedrow in violation of GINA, so the court grants the School Corporation's motion for summary judgment and denies Mr. Tedrow's as to his GINA retaliation claim.

IV. Conclusion

For these reasons the court:

(1) DENIES Mr. Tedrow's motion for summary judgment for all claims against Jill Britt and Melissa Morris, GRANTS Jill Britt and Melissa Morris's motion for summary judgment on all claims, and DISMISSES Jill Britt and Melissa Morris as defendants;

(2) DENIES Mr. Tedrow's motion for summary judgment as to his claims for breach of contract, Title VII discrimination, Title VII harassment, Title VII retaliation, ADA discrimination, ADA retaliation, GINA discrimination, and GINA retaliation;

(3) GRANTS the School Corporation's motion for summary judgment on Mr. Tedrow's claims for breach of contract, Title VII discrimination, Title VII

harassment, ADA discrimination, ADA retaliation, GINA discrimination, and GINA retaliation;

(4) GRANTS IN PART and DENIES IN PART the School Corporation's motion for summary judgment on Mr. Tedrow's Title VII retaliation claims, granting summary judgment on Mr. Tedrow's claim that the School Corporation retaliated against him for his pending EEOC charge and denying summary judgment on Mr. Tedrow's claims that the School Corporation retaliated against him for not agreeing to the last chance agreement.

SO ORDERED.

ENTERED: <u>May 23, 2023</u>


<u> /s/ Robert L. Miller, Jr.</u>
Judge, United States District Court


Distribution to all counsel of record via CM/ECF.